# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| DALE L. HELMIG, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:11-CV-04364-NKL |
| CARL A. FOWLER, et al., | ) |
| Defendants. | ) |

## ORDER

Plaintiff Dale Helmig alleges violations of federal and state laws arising out the Defendants' investigation of him and his prosecution for the murder of his mother, Norma Helmig. At the time of the investigation and prosecution, Defendant Carl Fowler was the Sheriff, and Defendant Paul D. Backues was the Deputy Sheriff, of Defendant Osage County, Missouri. Defendant Robert Westfall was a Trooper with the Missouri State Highway Patrol.

In his First Amended Complaint, Doc. 29, Helmig claims that all Defendants conspired to offer untruthful testimony (Count I) and that Defendants Osage County and Fowler failed to establish appropriate policies and adequately train law enforcement personnel (Count II). Helmig claims Defendants Fowler and Backues failed to disclose exculpatory evidence (Count III); fabricated evidence (Count IV); engaged in malicious prosecution in violation of federal law (Count V), and common law (Count VII); and committed false arrest (Count VI).

Pending before the Court is the motion for summary judgment on all counts filed by Defendants Fowler, Backues and Osage County.[1] Doc. 175. The motion is granted.

## I. Background[2]

Dale Helmig's parents, Norma and Ted Helmig, were in the process of divorcing at the time of Norma Helmig's death in 1993. Ted Helmig had moved out of the house, and in the months preceding his mother's death, Dale Helmig occasionally stayed there with his mother.

Norma Helmig was away from her home all evening on Wednesday, July 28, 1993 and returned home sometime in the early morning hours on Thursday, July 29, 1993. On Wednesday, July 28, 1993, Dale Helmig was working in Holt's Summit, Missouri. That day, roads closed due to flooding in the area and Helmig checked into a hotel in Fulton, Missouri. On Thursday, July 29, 1993, Helmig spent the night with Stacey Medlock at a motel in Eldon, Missouri.

Helmig took Medlock to his mother's house around noon on Friday, July 30, 1993. Helmig called the police, reporting that his mother was not there. Deputy Paul Backues

---

[1] The claims against Defendant Westfall were previously dismissed with prejudice, on Helmig's motion. Docs. 83 and 84.

[2] The Court has included those facts which are undisputed. To the extent Helmig claims certain of Defendants' facts are controverted—by making a general attack on the credibility of the speaker, but pointing to no evidence, *see* Doc. 183, pp. 27-28, ¶¶ 91-98—Helmig has failed to demonstrate a genuine dispute of material fact that will overcome Defendants' motion. *See Brown v. Scherrey,* 2006 WL 3361122, at *4 (E.D. Ark. 2006) ("To overcome a motion for summary judgment on the issue of credibility, the nonmoving party must do more than simply attack the credibility of the defendant-affiants….'[S]pecific facts must be properly produced.'") (quoting *Lundeen v. Cordner,* 354 F.2d 401, 409 (8th Cir. 1966)). *See also* Fed. R. Civ. Pro. 56(c)(1)(A) (a party who is asserting that a fact is genuinely disputed must support the assertion by citing to particular materials in the record).

was dispatched to the house. Helmig told Backues that he had been staying with his mother, but had been gone for several days and had returned at noon that same day. Helmig pointed out to Backues some things that were out of place in the house. Backues called Sheriff Carl Fowler to the scene. Fowler and Dale's Helmig's brother, Richard Helmig, both arrived at Norma's house at about the same time that evening. Helmig told Fowler that Norma Helmig's purse and other personal items were missing.

At some point, Backues learned from Helmig that Helmig had visitation with his two children scheduled for the next day, Saturday, July 31, 1993, and Backues told Helmig that it would not be a good idea for him to have his children at Norma Helmig's house on Saturday. Richard Helmig "told Dale to take the kids and, you know, get a room, go to my trailer, get a room, whatever he needed to do. Because he hadn't seen his kids for quite some time." Doc. 176-12, pp. 2-3.

Fowler and Backues were still at the house when Dale Helmig and Stacey Medlock left. On the drive back to Jefferson City, Medlock thought Helmig seemed worried. Helmig told Medlock that "someone must have gotten crazy drunk and killed" Norma Helmig. Doc. 176-1, p. 13, para. 93.

On Saturday, July 31, 1993, the police conducted an aerial search over Norma Helmig's house, and up and down the Gasconade River. Dale Helmig was not at the house during the search.

Norma Helmig's body was found in a river in Osage County, Missouri, on Sunday, August 1, 1993, clad in a nightgown and undergarments, with a concrete cinder block attached to her torso by a rope. An expert later opined that the time of death was

3

between 4:00 a.m. and 6:00 a.m. on Thursday, July 29, 1993, and that asphyxiation was the likely cause.

Prosecuting Attorney Robert Schollmeyer made the decision to charge Dale Helmig with her murder. Doc. 177-8, p. 5. An arrest warrant, signed by the Hon. Ralph Voss, Circuit Court of Osage County, issued on February 25, 2014 and Helmig was arrested on March 5, 1994. Doc. 177-4. Judge Voss held the preliminary hearing on April 8, 1994. The judge concluded, "[T]here's clearly enough evidence to get this…to a jury….I'm going to find probable cause, and…bind it over to a jury." Doc. 177-10, p. 2.

Helmig was tried by a jury in March 1996. The State presented no physical or direct evidence implicating Helmig. Fowler, Backues and Westfall were among the State's witnesses. Fowler testified that Norma and Ted Helmig were going through a divorce, that he had served the divorce papers on Ted, and that Norma had contacted the Sheriff's office "on a number of occasions about" the divorce situation, but he was not sure how many times he personally spoke with her. Doc. 177-9, pp. 16, 20. Fowler also testified that he had served a restraining order on Ted and that Norma was concerned about the restraining order. *Id.* at p. 16. Fowler explained that he did not know whether the restraining order included a restraint against physical threats, but that such a restriction would "pretty much" be a given on an ex parte order. *Id.* at p. 21. Fowler acknowledged that he received police reports from the Jefferson City Police Department in regard to Ted Helmig, and that a complaint had been filed about Ted throwing coffee at Norma at the Country Kitchen restaurant. *Id.* at p. 19

On the second day of the jury trial, Prosecutor Schollmeyer learned of an alleged

incident of violence between Dale Helmig and Norma Helmig and shared that information with Sheriff Fowler, Helmig's defense counsel, and the Court. Doc. 177-8, pp. 11-14; Doc. 177-3, pp. 9-10. Prosecutor Schollmeyer made a late motion to endorse Carol Miller McKinney and Darla Toebben Voss as additional witnesses because McKinney informed the state that Voss may have knowledge of an incident in which Dale Helmig threw hot coffee in Norma Helmig's face. Doc. 177-9, pp. 7-8.

The following exchange later took place during the State's redirect examination of Fowler:

> Q. Mr. Jordan asked you some questions about altercations. Have you become aware that Dale Helmig had an altercation with his mother?
> A. Yes.
> Q. Where?
> A. Country Kitchen.
> Q. When?
> A. The Sunday before her death.

*Id.* at p. 23. Dale Helmig's trial counsel did not object. *Id.*

Before he testified, Fowler was not aware of the prosecution's late endorsement of witnesses McKinney and Voss. Doc. 177-3, p. 14. Nor did Fowler know that he would be asked about an alleged altercation between Dale Helmig and Norma Helmig at the Country Kitchen restaurant. *Id.* at p. 13.

The State subsequently called Carol McKinney. During the State's direct examination of McKinney, the following exchange occurred:

> Q. Do you recall an incident a few days before the 28th of July involving the defendant and Norma Helmig?

>    A. Yeah, there was an incident at Country Kitchen with that.
>
>    Q. What do you know about this particular incident?
>
>    A. What I know about it is one of the other waitresses that was waiting on Norma came back in the galley and said her son had just threw coffee in her face.

Doc. 177-9, p. 24. The court sustained Helmig's hearsay objection and instructed the jury to disregard the testimony. *Id.* at pp. 24-25.

The defense called Jefferson City Police Officer Douglas Shoemaker, who testified that on July 11, 1993, he spoke with Norma Helmig about her complaint that Ted Helmig had thrown coffee at her in a restaurant early that morning. Norma told the officer that she had an ex-parte order against Ted. *Id.* at p. 28. Shoemaker noted in his police report that Ted had threatened Norma at the time, saying, "I'm going to put an end to this." *Id.* at p. 6.

Fowler had been trained that law enforcement officers have a responsibility to produce evidence that exonerates a defendant, as well as evidence that shows guilt. Doc. 177-3, pp. 15-17. Fowler established law enforcement policies for Osage County. Doc. 188-3, pp. 3-4. Osage County had written policies governing the Sheriff's Department from 1993 through at least 1996. Doc. 183-26, pp. 5, 7. The paper copies of those written policies were destroyed in late 2012 by the then-incoming sheriff. *Id.* But Fowler explained that it was the practice of the Osage County Sheriff's Department in 1993 and 1994 that evidence in a criminal investigation was to be documented in a report and that physical evidence would go into an evidence locker and reports would be placed

into a case file which was submitted to the prosecutor. Doc. 177-2, pp. 6-10; Doc. 177-3, p. 17.

Backues also testified at the trial. Helmig's counsel asked Backues if he interviewed anyone who had been at Norma's house on July 31, 1993, when the house was searched, and about "what was in the house on the 31st." Doc. 177-9, p. 9. When Backues repeated, "What was in the house on the 31st," Helmig's counsel asked Backues, "Were there any notes on a coffee table that you saw?" *Id.* Backues testified that he had seen notes on a coffee table, that he took some of them with him when he left, and that the notes he took were currently in a desk in his office. *Id.* at pp. 10-11. Helmig's counsel asked Backues to bring the notes to the court when he was re-called, which he did. *Id.* at pp. 12-13. The notes were Norma Helmig's, and included the date and time Ted Helmig had been served with the restraining order, and a reminder to herself to register her handgun. Doc. 183-25, p. 1.

Backues had been trained that he had a duty as a law enforcement officer to put all information about his investigation in a report, that the report would be placed with the case file, and that the information in the case file would be forwarded to a prosecuting attorney. Doc. 177-2, pp. 3, 19-21.

Prior to the trial, Prosecutor Schollmeyer was aware that Ted and Norma Helmig were separated and in the process of divorcing, Doc. 1777-8, p. 8; of allegations that Ted Helmig had abused Norma Helmig, *id.* at pp. 3, 8; of the temporary restraining order issued against Ted Helmig relating to Norma Helmig, *id.* at pp. 6-7; and that Norma Helmig had asked Carl Fowler for information about obtaining a handgun because Carl

7

Fowler told him about it, *id.* at pp. 9-10.

At the time of the trial, Chris Jordan, Dale Helmig's trial counsel, knew that Norma Helmig was claiming in the divorce proceeding that Ted Helmig abused her, that she had made the claim of abuse in connection with obtaining the temporary restraining order, and that Ted once threw coffee at her at the Country Kitchen restaurant. Doc. 177-6, pp. 3-4. Jordan was also aware that Norma Helmig had spoken with Fowler shortly before her death about registering a handgun, and that she was concerned about Ted Helmig hiding substantial sums of money from her. *Id.* at p. 5.

Dale Helmig knew that his father had moved out of the house as a result of a restraining order, Doc. 177-11, p. 4; knew his mother had been abused by his father, *id.* at pp. 4-7; and knew, because she told Dale, that Norma was afraid Ted Helmig would kill her, *id.* at p. 9. Dale Helmig was also aware of property disagreements between his parents. *Id.* at pp. 7-8. But Dale Helmig told a friend, Randy Goben, that if Ted Helmig was ever accused of murdering Norma Helmig, he (Dale) would come forward and lie and say he killed Norma to protect Ted. Doc. 177-5, pp. 2-3.

Dale Helmig was convicted on March 9, 1996 of Norma Helmig's murder, and subsequently sentenced to life in prison without parole. In 2011, the Missouri Court of Appeals held that Helmig was entitled to a writ of habeas corpus because he had been deprived of a fair trial, and ordered the State to retry him for the murder of Norma Helmig within 180 days or to discharge him from the State's custody. *See State ex rel. Koster v. McElwain,* 340 S.W.3d 221, 258 (Mo. Ct. App. 2011). The Osage County prosecutor decided not to retry Helmig and he was discharged.

## II. Discussion

### A. Count III, failure to disclose exculpatory evidence

Helmig alleges that Fowler and Backues failed to disclose exculpatory evidence, in violation of principles recognized in *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Doc. 29, pp. 42-44. In *Brady,* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley,* 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 433–35 (1995) (the accused must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

*Brady* has limitations. Evidence available to a defendant from other sources, or evidence already possessed by a defendant, need not be disclosed. *U.S. v. Jones,* 34 F.3d 596, 600 (8th Cir. 1994). Further, when the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed to the defendant during trial, *Brady* is not violated. *U.S. v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996); *U.S. v. Boykin,* 986 F.2d 270, 276 n.6 (8th Cir. 1993).

Helmig describes the undisclosed evidence as "[t]hree critically important pieces of information":

> (1) that Norma had contacted Sheriff Fowler five to fifteen times before her murder and those contacts concerned her husband [Ted Helmig] and Norma's concerns for her safety;
>
> (2) the facts that the alleged "altercation" at Country Kitchen supposedly involving Dale never occurred, was not "substantiated", and that there were no known witnesses to it; and,
>
> (3) that handwritten notes by Norma existed, notes that certainly implied Norma's fear of Ted.

Doc. 183, p. 68.[3]

The alleged failure to disclose the first and third pieces of evidence—Norma Helmig's five to fifteen contacts with Sheriff Fowler concerning her fear of Ted Helmig, and Norma's notes implying her fear of Ted—does not amount to a *Brady* violation. Norma Helmig's notes, even if not produced prior to trial, were produced during trial. Delaying disclosure of evidence until trial does not establish a *Brady* violation. *E.g., Gonzales*, 90 F.3d at 1368. Also, evidence of Fowler's five to fifteen contacts with Norma Helmig concerning her husband and fears for her safety was at best cumulative of evidence offered at trial that showed the same, such as the restraining order Norma obtained against Ted Helmig, the Country Kitchen incident, and Norma's application for a handgun permit. Failure to disclose cumulative evidence is not a *Brady* violation. *Clay v. Bowersox,* 367 F.3d 993, 1002-3 (8th Cir. 2004).

---

[3] With respect to Count I, the conspiracy claim, Helmig identifies a fourth incident of alleged nondisclosure, concerning the testimony of Tina Ridenhour, whom Helmig claims could have offered exculpatory evidence in the form of testimony that she observed Helmig's positive relationship with his mother shortly before her death. Doc. 183, p. 66. Helmig blames the prosecution for withholding this evidence, and concedes that "there is no evidence the defendants in this case were aware of or participated in that violation." *Id.*

Alternatively, "evidence which has no other effect than to cast bare suspicion on another is not admissible," and an accused may not introduce evidence that a third party had motive or opportunity to commit the crime with which the accused is charged, unless there is proof that the other party "committed some act directly connecting him with the crime." *State v. Butler*, 951 S.W.2d 600, 606 (Mo. banc 1997). Norma's handwritten notes and her statements to Fowler about Ted's abuse do not directly connect him with the crime, and in response to the motion for summary judgment, Dale Helmig makes no attempt to argue that they do. Thus, in the event this evidence was not cumulative, it was likely inadmissible. Therefore, there is no reasonable probability that the result of Dale Helmig's trial would have been different had this evidence been disclosed.

The remaining piece of evidence to which Dale Helmig points concerns Fowler's testimony that he became aware that Dale Helmig had an altercation with his mother in the Country Kitchen restaurant on the Sunday before her death. Helmig argues that the Defendants should have disclosed "the facts that the alleged 'altercation' at Country Kitchen supposedly involving Dale never occurred, was not 'substantiated', and that there were no known witnesses to it." Doc. 183, p. 68. In other words, Helmig is arguing that the Defendants had an affirmative duty to disclose that there was no evidence that the incident ever occurred. This is not "evidence" at all, but the absence of evidence. Helmig does not explain how the absence of evidence constitutes a *Brady* violation. In any event, the hearsay nature of the testimony was fleshed out at trial, and so was timely available to the defense.

To the extent Helmig argues that Fowler's testimony was baseless, whether

because Fowler knew it was false, or was simply careless in testifying, Helmig's § 1983 claim fails because Fowler has the absolute immunity afforded trial witnesses with respect to claims based on witness' testimony. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1505 (2012). This absolute immunity is broad, extending to law enforcement officers who testify in criminal proceedings, even if they commit perjury. *Briscoe v. Lahue*, 460 U.S. 325, 343 (1983).

Defendants' motion for summary judgment is granted with respect to Count III.

### B. Count IV, fabrication of evidence

Helmig alleges that Fowler and Backues fabricated evidence to secure his conviction, specifically:

> (i) Fowler's report regarding the fabricated incident in which [Dale Helmig] threw hot coffee at Norma Helmig at the Country Kitchen on the Sunday preceding her murder in an attempt to implicate Plaintiff; and,
>
> (ii) Backues directed Dale Helmig not to participate in the search for Norma Helmig on Saturday, July 31, 1993, because he had custody of his children, and thereafter, Backues attempted to imply that Plaintiff was guilty from his failure to participate in the search.

Doc. 29, p. 45, ¶ 328.

A fabrication of evidence claim requires proof that the officer deliberately created evidence in order to frame a criminal defendant. *Winslow v. Smith,* 696 F.3d 716, 732 (8th Cir. 2012) (citation omitted).

With respect to Fowler, the undisputed material facts are that Fowler was asked if he was "aware" of an incident involving Dale Helmig and his mother, and Fowler

repeated what he had heard from Prosecutor Schollmeyer. Doc. 177-9, p. 23. Helmig produced no evidence that Fowler fabricated the story, let alone that Fowler fabricated it in order to frame him. In any event, as noted above, trial witnesses, including law enforcement officers who testify at a criminal proceeding, even those who commit perjury, have absolute immunity from liability under §1983 with respect to any claim based on their testimony. *Rehberg,* 132 S.Ct. at 1505.

Helmig makes no response to the Defendant's motion with respect to his Count IV claim against Backues, and has therefore abandoned it for purposes of summary judgment. *See Thomas v. United Steelworkers Local 1938,* 743 F.3d 1134, 1141 (8th Cir. 2014) (non-movant abandons claim when no response is made to motion for summary judgment). Further, Helmig has produced no evidence that Backues deliberately fabricated anything.

Defendants' motion for judgment is granted with respect to Count IV.

### C. Count II, *Monell* liability

Helmig alleges that Osage County had improper law enforcement customs and policies, which were the moving force behind the violation of his rights, and that Sheriff Fowler, as the highest ranking law enforcement policy-maker of Osage County, was responsible for those policies. Doc. 29, pp. 38-53.

Under 42 U.S.C. § 1983, a municipality may not be held vicariously liable for the unconstitutional acts of its employees. *See Monell,* 436 U.S. at 694. But a municipality may be held liable for the unconstitutional acts of its employees when those acts implement or execute an unconstitutional municipal policy or custom. *Id.; see also*

*v. Washington County,* 150 F.3d 920, 922 (8th Cir.1998). To establish a municipality's liability, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." *Monell,* 436 U.S. at 694; *see also Board of Comm'rs v. Brown,* 520 U.S. 397, 400, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (holding that only "deliberate" action by a municipality can meet the "moving force" requirement).

A municipality cannot be liable under § 1983 for failure to train or supervise its police officers if the police officers did not commit a constitutional violation. *Gibson v. Cook,* 2014 WL 4085821, at *6 (8th Cir. Aug. 20, 2014) (police officers were held not liable for constitutional violations because they had probable cause, and city therefore could not be subject to liability under § 1983 for failure to train and supervise) (citing *Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011)).

Helmig argues that the County's policies did not satisfy the Constitution because

> certain information and documents were not disclosed to [him] as required: the existence of five to fifteen contacts by Norma with Sheriff Fowler; the facts concerning the non-substantiated 'altercation' at Country Kitchen; the existence of Norma's handwritten notes; and, the existence of exculpatory witness Tina Ridenhour. Each of those four nondisclosures violated *Brady* and establish a pattern sufficient to satisfy *Monell* [*v. Dep't of Soc. Svs.,* 436 U.S. 658 (1978)].

Doc. 183, p. 71.

The evidence shows that the County had policies in place and that Fowler and Backues had received training. Regardless of Helmig's argument that polices and training were not followed, he has failed to establish the commission of any of the alleged

14

constitutional violations by the County's law enforcement officers, as discussed above. His *Monell* claim therefore fails because he can point to no policy, practice, or custom that was a moving force behind the violation of his rights.

Defendants' motion for judgment is granted with respect to Count II.

### D. Count I, conspiracy

Helmig alleges that the Defendants conspired to violate his constitutional rights. Doc. 29, pp. 34-37.

To prove a § 1983 conspiracy claim, a plaintiff must show: 1) that the defendants conspired to deprive him of a constitutional right; 2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and 3) that the overt act injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). The plaintiff must also prove a deprivation of a constitutional right or privilege. *Id*. "A commonly held belief is not a conspiracy." *Meyers v. Morris*, 810 F.2d 1437, 1454 (8th Cir. 1987). Nor is a conspiracy shown by the mere fact that "[v]arious people engaged in investigating and reporting suspected criminal activity[.]" *Id.*

Helmig's conspiracy theory is "that Fowler, Backues, and Westfall agreed before testifying to participate in an orchestration of false evidence planned by [prosecutors] Hulshof and Schollmeyer." Doc. 183, p. 63. He argues that the prosecutors knew Tina Ridenhour was prepared to testify that Norma Helmig had a positive relationship with him, yet the prosecutors did not disclose Ridenhour as a witness. But he also admits that Defendants were not even aware of Ridenhour's potential testimony. Doc. 183, p. 66. At most, this was a *Brady* violation by prosecutors who are protected by absolute immunity.

The *Brady* claims concerning Norma's notes, and Fowler's testimony about a supposed incident between Dale Helmig and his mother at Country Kitchen were rejected in the discussion of Count III. The fabrication claim concerning the Country Kitchen incident was rejected in discussion of Count IV. Helmig abandoned his Count IV fabrication claim concerning Backues telling Helmig to keep his children away from the house on the day of the aerial search. Helmig points to the fact that the prosecutors met with the witnesses to prepare for their testimony, but the undisputed evidence is that this is standard practice. *See* Docs. 183, pp. 61-62 and 183-13, p. 5. Helmig's remaining arguments concern the prosecutors' strategy regarding presentation of Trooper Westfall's and Stacy Medlock's testimony. *See* Doc. 183, pp. 67-68. Such strategy is clearly covered by prosecutorial immunity.

Helmig's conspiracy arguments are, in essence, an attempt to demonstrate a conspiracy to offer untruthful testimony. A conspiracy claim cannot be based on such a premise, because prosecutors have absolute prosecutorial immunity, and witnesses have absolute testimonial immunity. *See Snelling v. Westhoff,* 972 F.2d 199, 200 (8th Cir. 1992) (and citations therein).

Further, and as discussed above, Helmig cannot establish the deprivation of any constitutional right. Absent an underlying violation, his conspiracy claim fails. *Askew*, 191 F.3d at 957.

Defendants' motion for judgment is granted with respect to Count I.

### E. Counts V and VII, malicious prosecution

In Count V, labeled as a § 1983 claim, and Count VII, labeled as a common law claim, Helmig alleges Fowler and Backues maliciously prosecuted him.

It is unclear under Eighth Circuit case law whether a § 1983 claim for malicious prosecution is cognizable. In a pair of 2001 decisions, the court observed that malicious prosecution, alone, is not a constitutional injury. *See Kurtz v. City of Shrewsbury,* 245 F.3d 753, 758 (8th Cir.2001) ("Moreover, this court has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury."); *Technical Ordnance, Inc. v. United States,* 244 F.3d 641, 650 (8th Cir. 2001) ("The general rule is that an action for malicious prosecution does not state a claim of constitutional injury."). More recently, the court expressed uncertainty as to whether "malicious prosecution is a constitutional violation at all." *Harrington v. City of Council Bluffs, Iowa,* 678 F.3d 676, 679 (8th Cir. 2012). And in *Bates v. Hadden,* the court declined to decide the issue, holding simply that a police officer would be entitled to qualified immunity, because no constitutional right to be free from malicious prosecution had been clearly established in 2010. 2014 WL 4065670 *3 (8th Cir. Aug. 19, 2014) (*citing Harrington,* 678 F.3d at 680).

Helmig alleges that Fowler and Backues' malicious prosecution of him violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Doc. 29, p. 47, ¶ 342. Helmig's response to the Defendants' motion for summary judgment with respect to this claim consists of one sentence in which he lists the Amendments, plus a citation to *Gunderson v. Schleuter,* 904 F.2d 407

(8th Cir. 1990), a case that preceded *Kurtz, Technical Ordinance, Harrington,* and *Bates*, discussed above.

Even if the Eighth Circuit recognized a malicious prosecution claim under § 1983, Helmig's claim would fail because the existence of probable cause for Helmig's arrest and prosecution defeats it. *See Fagnan v. City of Lino Lakes, Minn.,* 745 F.3d 318, 324 (8th Cir. 2014) (probable cause supporting warrant and arrest would defeat § 1983 claim for malicious prosecution); and *Harrington,* 678 F.3d at 679–801 ("Sufficient probable cause would defeat section 1983" against arresting officers "based on malicious prosecution[.]"). A state court judge signed Helmig's arrest warrant, and found probable cause at Helmig's preliminary hearing. In 2011, when the Missouri Court of Appeals held that Helmig was entitled to a writ of habeas corpus, the court did not find a lack of probable cause—the court ordered the State to retry him for the murder within 180 days or to discharge him. *State ex rel. Koster,* 340 S.W.3d at 258. Probable cause existed. Helmig's § 1983 claim for malicious prosecution therefore fails.

Helmig's common law claim also fails, at minimum, because of the existence of probable cause. A claim under Missouri law for malicious prosecution requires: 1) commencement of a prosecution against the accused; 2) instigation of that prosecution by the defendant; 3) termination of the proceeding in favor of the accused; 4) lack of probable cause for the prosecution; 5) evidence that the defendant's conduct was motivated by malice; and 6) harm to the accused as a result of the malicious prosecution. *Cassady v. Dillard Dept. Stores,* 167 F.3d 1214, 1219 (8th Cir. 1999); *Sanders v. Daniel Int'l Corp.,* 682 S.W.2d 803, 807 (Mo. 1984). As noted above, probable cause existed.

Defendants' motion for judgment is granted with respect to Counts V and VII.

### F. Count VI, false arrest

Finally, Helmig alleges that Fowler and Backues committed the common law tort of false arrest. Doc. 29, pp. 48-49.

A false arrest occurs when there is a confinement without legal justification. *Day v. Wells Fargo Guard Service Co.,* 711 S.W.2d 503, 504 (Mo. 1986) (holding that plaintiff must prove that there was confinement without legal justification); *Desai v. SSM Health Care*, 865 S.W.2d 833, 836 (Mo. Ct. App. 1993) (same). A police officer is empowered to make an arrest based on reasonable grounds to believe that the person is guilty of the offense. *Rustici v. Weidemeyer*, 673 S.W.2d 762, 769 (Mo. 1984). Liability for false arrest cannot be based on the bare fact that the suspect is later proven innocent or the charges are dismissed. *Hannah v. City of Overland*, 795 F.2d 1385, 1389 (8th Cir. l986) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)).

As noted above, a state court judge issued a warrant for Helmig's arrest and at the preliminary hearing found probable cause to proceed with the prosecution. The Missouri Court of Appeals did not disturb any findings of probable cause. Because legal justification for Helmig's arrest existed, Fowler and Backues cannot be liable for the common law tort of false arrest.

Defendants' motion for judgment is granted with respect to Count VI.

## III. Conclusion

Defendants Fowler, Backues and Osage County's motion for summary judgment, Doc.175, is granted.

                                                    s/ Nanette K. Laughrey
                                                    NANETTE K. LAUGHREY
                                                    United States District Judge

Dated:  September 17, 2014
Jefferson City, Missouri